# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CT-00114-SCT

*JAMES ROBERT DELKER*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/19/2007 |
| TRIAL JUDGE: | HON. ROBERT WALTER BAILEY |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT H. COMPTON |
| | JOHN G. COMPTON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/07/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     James Robert Delker was convicted in the Circuit Court of Lauderdale County, Mississippi, of felony driving under the influence ("DUI") and was sentenced, as a habitual offender, to serve the maximum term of five years in the custody of the Mississippi Department of Corrections ("MDOC"). Delker appealed his conviction and sentence and the case was assigned to the Mississippi Court of Appeals for disposition. *See* Miss. R. App. P. 16(d). Delker contended that the circuit court had erred in denying his motion to suppress all evidence obtained from an allegedly illegal search and seizure. *See **Delker v. State***, 2009

WL 2902631, at *2-3 (Miss. Ct. App. Sept. 11, 2009). The Court of Appeals affirmed Delker's conviction and sentence, concluding, in pertinent part, that "[e]ven if we were to find [the] . . . arrest of Delker was unlawful, based on the United States Supreme Court's holding in *Herring v. State*, __ U.S. __, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009), we would still find that Delker's driving under the influence should not be suppressed." *Delker*, 2009 WL 2902631, at *9.

¶2. This Court granted Delker's petition for writ of certiorari. *See Delker v. State*, 31 So. 3d 1217 (Miss. Apr. 15, 2010). We granted Delker's petition to determine if the Court of Appeals failed to consider a "controlling constitutional provision[,]" i.e., the Fourth Amendment to the United States Constitution and Article 3, Section 23, of the Mississippi Constitution, and address whether the circuit court erred in denying Delker's motion to suppress. Miss. R. App. P. 17(a); Miss. R. App. P. 17(h) ("[t]he Supreme Court may limit the question on review").

¶3. A Fourth Amendment violation does not automatically precipitate the exclusion of evidence. Rather, it sets into motion a separate inquiry, i.e., whether application of the exclusionary rule outweighs the costs to society in allowing the criminal to be set free. *See Herring*, 129 S. Ct. at 700 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006)) ("exclusion 'has always been our last resort, not our first impulse'"). Each case must be considered based upon the facts presented in that case. We find the exclusionary rule inapplicable in Delker's case and affirm the result reached by the circuit court and affirmed by the Court of Appeals.

2

¶4. In the late hours of Christmas Eve 2005, the Chief of Police of the Town of Marion, Mississippi, Ben Langston, was on duty in his police cruiser at the entrance of Valley Ridge Apartments, within the Marion city limits. He observed a car drive by at approximately ten miles over the speed limit, traveling east on Old Country Club Road, just outside the town limits. Langston mistakenly believed the road was within the Town of Marion.

¶5. Langston commenced pursuit with the intention of giving the driver (later determined to be Delker) a warning. But the driver did not respond to the officer's blue lights. Instead, he sped up to approximately sixty to sixty-five miles per hour, overtook and passed a car stopped at a stop sign, then drove through the stop sign. Eventually, he stopped in the driveway of his home. While following the speeding vehicle, Langston radioed for assistance from the Lauderdale County Sheriff's Department.

¶6. When Langston approached the stopped car, he observed that Delker had trouble getting out of his car, had difficulty standing, and had slurred speech. Langston also noticed the smell of alcohol emanating from Delker's car and saw an empty beer can on the front seat. Langston testified that when he asked why Delker had not stopped, Delker responded, "that he knew he was going to jail, and he didn't want to leave his car along side the roadway."

¶7. When Deputy Karey Williams of the Lauderdale County Sheriff's Department arrived, Delker was handcuffed. Williams offered to let Delker take a portable breathalyzer test,

---

[1]The underlying facts are more fully stated by the Court of Appeals and are not completely restated by this Court. *See Delker*, 2009 WL 2902631, at *1-2.

which Delker refused. Williams then transported Delker to the Lauderdale County Sheriff's Department, where he administered field sobriety tests to Delker. According to Williams, Delker failed some aspects of these tests and refused to blow into the Intoxilizer 8000 machine.

¶8. Delker subsequently was indicted for felony DUI,[2] and the indictment later was amended to charge Delker as a habitual offender. Thereafter, Delker filed a motion to suppress all evidence obtained as a result of his search and arrest. This evidence included: (1) an empty beer can and a near-empty whiskey bottle found in Delker's car; (2) the odor of alcohol; (3) Langston's and Williams's observations of Delker's behavior; (4) Delker's refusal of the portable breathalyzer test; (5) Delker's failure in the field sobriety test; and (6) Delker's refusal to blow into the Intoxilizer 8000 machine. In support of the motion to suppress, Delker argued that Langston had lacked authority to stop and arrest him because Delker had not committed any offense in Langston's jurisdiction. As such, Delker contended that the search and seizure was illegal under the Fourth and Fourteenth Amendments to the United States Constitution and Article 3, Section 23, of the Mississippi Constitution, and all evidence obtained was inadmissible under the exclusionary rule as "fruit of the poisonous tree."

---

[2]The record reflects that in September 1998, Delker pleaded guilty to felony DUI and was sentenced by the Circuit Court of Lauderdale County to five years in the custody of the MDOC with three and one-half years suspended and five years of supervised probation. In August 2000, Delker was found in violation of the terms and conditions of his probation after consuming alcohol in a local restaurant, had his probationary status revoked, and was sentenced to serve three and one-half years in the custody of the MDOC. On April 11, 2005 and March 2, 2006, Delker pleaded guilty to separate charges of driving under the influence arising from separate incidents.

¶9.  The circuit court denied Delker's motion to suppress, concluding that Langston had acted as a private citizen and had possessed the authority to effectuate a citizen's arrest under the circumstances.  According to the circuit court, a private citizen is authorized by Mississippi Code Section 99-3-7 to make an arrest if a misdemeanor is committed in his presence.  *See* Miss. Code Ann. § 99-3-7 (Rev. 2007).  Therefore, the circuit court held that the traffic stop was legal and the evidence obtained was not subject to the exclusionary rule.

¶10.  The Court of Appeals affirmed the circuit court's result, but for different reasons.  *See* **Delker**, 2009 WL 2902631, at *5.  That court determined that the circuit court had erred in finding that a private person could arrest another for the misdemeanor offense of speeding "because, under section 99-3-7(1), the only non-felony or non-indictable offense committed in the citizen's presence that gives rise to his authority to arrest the perpetrator is an offense constituting a breach of the peace threatened or attempted."  *Id.* at *5.  But the Court of Appeals further held that Langston's citizen's arrest was permissible because (1) it was not effectuated until after Langston had stopped Delker and observed his probable guilt of an indictable offense (felony DUI), and (2) Langston had authority to initiate pursuit as a private citizen since Delker had committed an indictable offense (felony DUI), although Langston lacked any knowledge of it.  *See id*. at *5-8.  Alternatively, the Court of Appeals held that even if Delker's arrest was illegal, the evidence obtained should not be suppressed under the exclusionary rule because Langston's *mistake* about the boundaries of his jurisdiction did not rise to the **Herring** standard of "deliberate, reckless, or grossly negligent conduct . . . ."  *Id*. at *9 (citing **Herring**, 129 S. Ct. at 702).

5

¶11. "In reviewing the denial of a motion to suppress, we must determine whether the trial court's findings, considering the totality of the circumstances, are supported by substantial credible evidence." *Moore v. State*, 933 So. 2d 910, 914 (Miss. 2006). But this Court will also reverse the admission of the evidence if an incorrect legal standard was applied. *See id*. at 918. The standard of review for questions of law is de novo. *See Hood v. State*, 17 So. 3d 548, 551 (Miss. 2009).

¶12. This Court declines to delve into the legality, *vel non*, of the arrest. For purposes of deciding this case, we indulge Delker's contention "that there was a Fourth Amendment violation. The issue is whether the exclusionary rule should be applied." *Herring*, 129 S. Ct. at 699. Even in the event of a Fourth Amendment violation, the supreme law of the land requires a case-by-case "balancing test" to be performed, and suppression ordered "only in those unusual cases in which exclusion will further the purpose of the exclusionary rule." *Kansas v. Ventris*, __ U.S. __, 129 S. Ct. 1841, 1845, 173 L. Ed. 2d 801 (2009) (requiring "balancing test"); *United States v. Leon*, 468 U.S. 897, 918, 104 S. Ct. 3405 (1984). Specifically:

> [t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter *deliberate, reckless, or grossly negligent conduct*, or in some circumstances recurring or systemic negligence.

*Herring*, 129 S. Ct. at 702 (emphasis added).

¶13. Without question, Langston *mistakenly* believed the road to be within the Town of Marion, indeed the record supports no other finding. A "mistake" is defined as "1. An error:

6

fault. 2. A misconception: misunderstanding." Webster's II *New College Dictionary* 702 (1995). In pursuing Delker, Langston was merely going to warn him to slow down, in the interest of protecting the citizens (including Delker) from harm, rather than seeking to effectuate an arrest and seizure. Langston's error of not knowing the exact jurisdictional boundaries of the Town of Marion was, at worst, an innocent mistake. The record provides not one iota of evidence to the contrary.

¶14.    An "innocent mistake" is "far removed from the core concerns that led [the United States Supreme Court] to adopt the [exclusionary] rule in the first place." *Herring*, 129 S. Ct. at 698, 702-03 (quoting *Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)). Not a scintilla of evidence exists in this record that Langston's conduct was "deliberate, reckless, or grossly negligent"[3] or a form of "recurring or systemic negligence[,]" as mandated by the United States Supreme Court to invoke the exclusionary rule. *Herring*, 129 S. Ct. at 702. Nor does any evidence support that Langston's conduct was outrageous, reprehensible, or glaringly bad (i.e., flagrant).

---

[3]Nonetheless, the dissent advances the argument that Langston's mistake regarding municipal boundaries was either gross negligence or reckless disregard, and then cites "one of the approximate" definitions of "gross negligence" from a civil case. *Dame v. Estes*, 233 Miss. 315, 318, 101 So. 2d 644, 645 (1958). *Dame*, although civil in nature, is instructive insofar as it provides an example of conduct which this Court found to have created a jury question on the issue of punitive damages. *See id*. The dissent equates Langston's mistake to a speeding motorist, estimated by witnesses to be driving fifty miles per hour in a thirty-mile-per-hour zone, who, in broad daylight, "either ignored or wholly failed to see the stop sign which was staring her in the face . . . or to even check the speed of the automobile she was driving[,]" then "wholly failed to see the appellant's pickup truck until it was directly in front of her . . . ." *Id*. That accident and the conduct at issue here are plainly distinguishable. (Diss. Op. at ¶ 26).

7

¶15.   Moreover, while the dissent emphasizes the purported "flagrancy" of Langston's conduct, this Court notes that the "flagrancy of police misconduct" requires consideration of "the actions of *all the police officers involved*." *Id*. at 700 (quoting *Leon*, 468 U.S. at 911, 923 n.24) (emphasis added).   Williams's response to Langston's radioed request for assistance from the Lauderdale County Sheriff's Department while in pursuit of Delker was altogether reasonable.  Williams had no reason to know of Langston's error.  Accordingly, considering "the actions of all the police officers involved[,]" neither Langston's innocent error nor Williams's proper and reasonable response of assistance could be characterized as "so objectively culpable as to require exclusion." *Herring*, 129 S. Ct. at 703.

¶16.   But for those who would opine that Langston's error was more than a mere mistake, exclusion still is not automatic.  Exclusion is proper only after an unbiased weighing is conducted on the scales of justice.  In one tray is the "appreciable" or "substantial" deterrence gained by exclusion and in the other tray are the "substantial social costs" and "harm to the justice system" resulting from exclusion. *Id*. at 700-01, 704 (quoting *Leon*, 468 U.S. at 909; *Illinois v. Krull*, 480 U.S. 340, 352-53, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987)).  In weighing these competing claims, "the rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." *Herring*, 129 S. Ct. at 701 (quoting *Pa. Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 364-65, 118 S. Ct. 2014, 141 L. Ed. 2d 344 (1998)).

¶17.   Any purported deterrent effect in encouraging officers to be aware of jurisdictional boundaries is dubious at best, given the dearth of similar cases involving errors in jurisdictional boundaries presented to this Court over the years.  This alone should negate

8

any perception of the beneficent need for exclusion to the end of "appreciable" or "substantial" deterrence of such errors in the future. *Herring*, 129 S. Ct. at 700-01. But even assuming *arguendo* that a marginal deterrent effect exists, it is significantly outweighed by the "substantial social costs" and "harm to the justice system" exacted by exclusion. *Id*. at 700-02, 704. It takes neither a judge nor a lawyer to recognize the compelling social interest in protecting innocent citizens from drunk drivers and the offense to "basic concepts of the criminal justice system" by "letting guilty and possibly dangerous defendants go free." *Herring*, 129 S. Ct. at 701 (quoting *Leon*, 468 U.S. at 908). Here, a multiple DUI offender, who was driving under the influence on Christmas Eve, would not be required to answer for his actions because of Langston's error. The counter-effect would be that innocent citizens of this State, who look to the government for protection from drunk drivers, would be subjected to the potentially fatal risk of a recalcitrant, multiple-DUI offender being placed back on their roadways. This risk only adds to the undeniable substantial social costs exacted by drunk drivers through not only fatalities,[4] but also through grief to the survivors; personal injuries ranging from catastrophic to minor; and property loss. Moreover, harm to the justice system is self-evident.[5] Delker has demonstrated a deliberate, reckless, and flagrant disrespect of the laws of this State, despite opportunity after opportunity to alter his conduct.

---

[4]In 2007 and 2008 alone, 582 drunk-driving-related deaths occurred in Mississippi. *See* National Highway Traffic Safety Administration, "2008 Traffic Safety Annual Assessment -- Highlights," at http://www-nrd.nhtsa.dot.gov/Pubs/811172.pdf (last visited Sept. 28, 2010).

[5]The Legislature has responded to the carnage resulting from drunk driving. In the past ten years, amendments to Mississippi Code Section 63-11-30 have decreased legal blood alcohol levels from 0.10% to 0.08% and increased penalties for violations. *See* Miss. Code Ann. § 63-11-30 Historical and Statutory Notes (Rev. 2004).

¶18. All can agree that where law-enforcement officers abuse our sacred Constitution and the laws of our land to effect convictions by "deliberate, reckless, or grossly negligent conduct, or . . . recurring or systemic negligence[,]" application of the exclusionary rule is not only necessary, but also laudable.[6] *Herring*, 129 S. Ct. at 702. But such is not the case before this Court today. When police mistakes are not the result of "systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" *Id*. at 704 (quoting *Leon*, 468 U.S. at 907-08 n.6). The "substantial social costs" and "harm to the justice system" resulting from giving the keys to the jail to a serial drunk driver, under the facts and circumstances presented here, far outweigh any imagined deterrent effect. *Herring*, 129 S. Ct. at 700-02, 704.

¶19. Our ruling is not only consistent with recent United States Supreme Court rulings, but also finds support from such respected jurists as Judges Benjamin Cardozo and Henry J. Friendly. In considering the high price on the criminal justice system exacted by the exclusionary rule, Judge Cardozo questioned whether the criminal should "go free because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926)

---

[6]For examples, *see Mapp v. Ohio*, 367 U.S. 643, 644-45, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (exclusionary rule applied to flagrant and deliberate violation of the defendant's rights when officers brandished a false warrant, forced open the door of her home, prevented her lawyer from entering, handcuffed her, and proceeded to search her home for obscene materials); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 390, 40 S. Ct. 182, 64 L. Ed. 319 (1920) (exclusionary ruled applied when federal officials "without a shadow of authority" went to the defendant's office and "made a clean sweep" of every paper they could find); *Weeks v. United States*, 232 U.S. 383, 393-94, 34 S. Ct. 341, 58 L. Ed. 652 (1914) (exclusionary rule applied when, without a search warrant, officers broke into defendant's home, confiscated incriminating papers, then returned later to confiscate more, under circumstances in which "not even an order of court would have justified such procedures").

(opinion of the Court by Cardozo, J.). Similarly, Judge Friendly argued that a mere "blunde[r]" or "slight and unintentional miscalculation" ought not compel application of the exclusionary rule, as deterrence could be "sufficiently accomplished" by confining its application to "evidence obtained by flagrant or deliberate violation of rights." Friendly, Henry J., *The Bill of Rights as a Code of Criminal Procedure*, 53 Calif. L. Rev. 929, 952-53 (1965). Such a well-reasoned, balanced approach should be no different in today's decision. Applying that approach, as the Court of Appeals did, the exclusionary rule is inapplicable here. *See **Delker***, 2009 WL 2902631, at *9 ("we do not find that [Langston's] mistake concerning the location of the municipal limits of the [T]own of Marion rises to the standard of conduct articulated in ***Herring***"). Today's opinion neither expands nor erodes the exclusionary rule, nor does it transform or expand traditional notions of the distinctions between negligence, gross negligence, and reckless disregard. As the circuit court reached the right result in denying Delker's motion to suppress, albeit for the wrong reason, this Court affirms the result of that ruling. *See **Green v. Cleary Water, Sewer & Fire Dist.***, 17 So. 3d 559, 572 (Miss. 2009) (citations omitted) ("[i]t is well established in our jurisprudence that the right result reached for the wrong reason will not be disturbed on appeal").

## CONCLUSION

¶20. As the seized evidence was not subject to the exclusionary rule, this Court affirms the judgment of the Circuit Court of Lauderdale County.

¶21. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. CONVICTION OF FELONY DRIVING UNDER THE INFLUENCE (DUI) AND SENTENCE, AS A HABITUAL OFFENDER, OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

11

**CARLSON, P.J., DICKINSON, LAMAR, AND PIERCE, JJ., CONCUR. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND KITCHENS, J. GRAVES, P.J., NOT PARTICIPATING.**

**CHANDLER, JUSTICE, DISSENTING:**

¶22. Because I believe today's decision erodes the exclusionary rule in Mississippi by holding that a police chief's ignorance of his municipality's boundaries was an innocent mistake, I respectfully dissent. Chief Langston's pursuit of Delker was plainly violative of the Fourth Amendment because, outside his jurisdiction, Chief Langston lacked any legal authority whatsoever to initiate pursuit of Delker for the misdemeanor offense of traveling ten miles per hour over the speed limit. Miss. Code Ann. § 99-3-7(a) (Rev. 2007). In my view, knowledge of jurisdictional boundaries is a fundamental duty of law enforcement, and Chief Langston's total ignorance of the municipal boundary was at least gross negligence, if not reckless disregard for the constitutional rights of Delker and other motorists traveling on Old Country Club Road. I believe that applying the exclusionary rule in this case obviously would encourage law enforcement to be cognizant of jurisdictional boundaries by excluding evidence obtained from illegal, extrajurisdictional arrests. Therefore, I would reverse the trial court's denial of Delker's motion to suppress.

¶23. I begin with a brief discussion of ***Herring v. United States***, ___ U.S. ___, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009), in which the United States Supreme Court applied the good-faith exception to the exclusionary rule in the context of negligent record-keeping by the police. In ***Herring***, officers stopped Herring and arrested him based on a warrant issued in a neighboring county. ***Id.*** at 698. A search incident to the arrest yielded drugs and a gun. ***Id.*** However, it turned out that, unknown to the arresting officers, the warrant had been

12

recalled, and the issuing department negligently had failed to update the database. *Id.* The Supreme Court found that the good-faith exception to the exclusionary rule applied, because "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" *Id.* at 704. The court described the conduct at issue as "isolated negligence attenuated from the arrest." *Id.* at 698. The court held that:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. *As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.*

*Id.* at 702 (emphasis added). Thus, for example, "[i]f the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests, exclusion would certainly be justified under our cases should such misconduct cause a Fourth Amendment violation." *Id.* at 703.

¶24. The court stated that it had "never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." *Id.* at 700. Rather, the exclusion question "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Id.* at 698. The court explained that, because the purpose of the rule is to deter police misconduct, an assessment of the flagrancy of police misconduct is necessary in each case. *Id.* at 701. "[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* (quoting *Illinois v. Krull*, 480 U.S. 340, 352-353, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987)). Finally,

13

the analysis of deterrence and culpability is an objective inquiry of "whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances," which will frequently include the officer's knowledge and experience. *Id.* at 703 (quoting ***United States v. Leon***, 468 U.S. 897, 922 n.23, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984)).

¶25.    In my opinion, the police misconduct at issue easily meets the standard for exclusion announced in ***Herring***.  Knowledge of jurisdictional boundaries is one of the fundamental duties of a chief of police.  *See* Miss. Code Ann. 21-21-1 (Rev. 2007) ("the . . . chief of police shall be an ex officio constable within the boundaries of the municipality" and "shall be the chief law enforcement officer of the municipality and shall have control and supervision of all police officers employed by said municipality").  Chief Langston testified that he had been unaware that Old Country Club Road was outside his jurisdiction until shortly before the hearing on the motion to suppress, when a county road crew correctly informed him that the road was outside his jurisdiction.  Chief Langston provided no explanation for why he had been unaware of the municipal boundaries of Marion.  Rather, it seems that Chief Langston merely assumed that Old Country Club Road was within his jurisdiction.  Indeed, as the majority points out, Chief Langston was "mistaken." But the presence or absence of a mistake by the police is not the standard for application of the exclusionary rule.  A "mistake" is not a legally recognized mental state, nor was a "mistake" a legal standard announced in ***Herring***.   Rather, ***Herring*** referred to the familiar classifications of conduct as negligent, grossly negligent, reckless, or intentional. ***Herring***, 129 S. Ct. at 702.

14

¶26. I assert that a reasonably well-trained chief of police would have ascertained the jurisdictional boundaries of his town, and that Chief Langston's ignorance of the municipal boundaries under the facts of this case was at least gross negligence. This Court has defined "'gross negligence' [a]s that course of conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them." *Dame v. Estes*, 233 Miss. 315, 318 101 So. 2d 644, 645 (1958). In my opinion, it is beyond peradventure that a police chief's ignorance of the fact that a highway lies outside his jurisdiction is at least gross negligence. As the police chief, Chief Langston was responsible not only for acquiring accurate knowledge of jurisdictional boundaries, but also for conveying that knowledge to subordinate officers. Miss. Code Ann. § 21-21-1 (Rev. 2007). His ignorance of the boundary disclosed a reckless indifference to the consequences of that lack of knowledge; that is, a reckless indifference to the consequences of attempting to exercise authority outside his jurisdiction, including the violation of individuals' civil rights. And Chief Langston exerted no substantial effort to avoid these consequences by simply learning the true municipal boundaries. So considered, Chief Langston's error evinced reckless disregard for the constitutional rights of travelers on Old Country Club Road. This flagrant level of police culpability mandates exclusion. *Herring*, 129 S. Ct. at 701.

¶27. The flagrancy of Chief Langston's misconduct becomes even more obvious when contrasted with the negligent conduct that was at issue in *Herring*. In *Herring*, the police made a record-keeping error when, for whatever reason, a computer database was not updated. *Id.* at 698. This was a negligent failure to act attenuated from the arrest. *Id.* at 698.

15

Here, Chief Langston's error was not attenuated from his illegal pursuit of Delker, because he was actively patrolling outside his jurisdiction at the time he initiated pursuit.

¶28.    I would find that excluding the evidence procured from Chief Langston's illegal pursuit of Delker would have a meaningful deterrent effect by encouraging the basic competence of our law enforcement officers.  The majority opines that, because this Court has not decided many cases involving errors in jurisdictional boundaries, "any purported deterrent effect" is "dubious at best." *Maj. Op.* at ¶17.  First, I observe that this Court has decided cases involving extrajurisdictional arrests, and the majority provides no guidance as to how many more appellate decisions would suffice for it to place a value on deterrence. *See Nash v. State*, 207 So. 2d 104, 106-07 (Miss. 1968); *Shinall v. State*, 199 So. 2d 251, 256-57 (Miss. 1967) (overruled on other grounds).  Second, I observe that the issue of how many cases have managed to work their way through each level of our justice system to finally arrive at this Court to present the issue of an extrajurisdictional arrest is hardly relevant to whether exclusion would deter the police from acting outside their jurisdictions.

¶29.    The main purpose of the exclusionary rule "is to deter – to compel respect for the constitutional guaranty in the only effectively available way – by removing the incentive to disregard it." *Elkins v. U.S.*, 364 U.S. 206, 217, 80 S. Ct. 1437, 1444, 4 L. Ed. 2d 1669 (1960).  I believe that Chief Langston's error was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 129 S. Ct. at 702.  In my opinion, it would be elementary in most instances for the police to acquire knowledge of jurisdictional boundaries, and

16

requiring police to know the boundaries or face exclusion of evidence would have a meaningful deterrent effect.

¶30.    Regarding the price paid by the justice system, I fully agree with the majority's condemnation of drunk drivers such as Delker.  But, while keeping "a guilty and possibly dangerous defendant" imprisoned and away from the public is always a commendable endeavor, my primary concern, as it must be, is for the proper application of the law.  By discounting the significance of Chief Langston's error, the majority encourages the State's law enforcement officers' ignorance of jurisdictional boundaries when initiating pursuit of misdemeanants—persons the officer observes to be merely traveling a few miles over the speed limit or committing other minor traffic violations.  Most vitally, by casting Chief Langston's gross negligence as simple negligence, today's decision may greatly expand the practice of judicial forgiveness of police misconduct that violates individuals' Fourth Amendment rights.  I believe it is the proper role of this Court to deter such police misconduct by excluding its fruits and safeguarding individuals' freedom from unreasonable searches and seizures.

¶31.    In conclusion, I would reverse the trial court's denial of the motion to suppress.

**WALLER, C.J., AND KITCHENS, J., JOIN THIS OPINION.**

17